# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 17, 2010 Session

## STATE OF TENNESSEE v. JEFF CARTER

### Appeal from the Circuit Court for Wayne County
### No. 14129      Jim T. Hamilton, Judge

---

### No. M2009-02399-CCA-R3-CD - Filed December 16, 2010

---

The Defendant, Jeff Carter, was charged with one count of rape of a child, a Class A felony. See Tenn. Code Ann. § 39-13-522(b). Following a jury trial, he was convicted of one count of aggravated sexual battery of a victim less than thirteen years old, a Class B felony. See Tenn. Code Ann. § 39-13-504(b). In this direct appeal, the Defendant contends that: (1) the trial court erred in allowing the State to use the doctrine of election to offer proof of prior bad acts, after the State had provided a bill of particulars describing one particular incident and repeatedly said that it intended on electing that incident; (2) the trial court did not follow the procedures mandated in Rule 404(b) of the Tennessee Rules of Evidence; (3) the trial court erred by allowing the jury to hear about prior bad acts that occurred outside the time frame of the indictment; (4) the evidence at trial was insufficient because there was no evidence offered to support the time frame stated in the indictment; (5) the trial court erroneously allowed three witnesses to testify that the Defendant had confessed to them, without finding whether the alleged confessions pertained to the charged crime or prior bad acts; and (6) the trial court's failure to give a specific unanimity instruction was reversible error. After reviewing the record, we conclude that the trial court did commit reversible error when it allowed testimony of other bad acts and three irrelevant admissions of guilt that the Defendant allegedly made. Thus, we reverse the judgment of the trial court and remand the case for a new trial.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Remanded

DAVID H. WELLES, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Patrick G. Frogge, Nashville, Tennessee (on appeal); John Russell Parks, Columbia, Tennessee (at trial); and Joshua Howard Polk, Waynesboro, Tennessee (at trial), for the appellant, Jeff Carter.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Mike Bottoms, District Attorney General; and Doug Dicus, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

On December 4, 1997, A.C.,[1] then seven years old, alleged that her step-father, the Defendant, raped her. However, four days later, after a police investigation began, A.C. recanted her allegations and the State took no further action against the Defendant at that time. Then, in January 2007, after her mother and the Defendant had separated, A.C. renewed her allegations that the Defendant raped her when she was a child. On February 6, 2007, a Wayne County grand jury indicted the Defendant for rape of a child, occurring "on or about" May or June 1996. The Defendant's trial was held July 21-23, 2008.

A.C., born on April 27, 1990, testified that in 1996, when she was six years old, her family lived in Collinwood. She testified that one time, when her mother, brother, and younger sister were not at home, the Defendant told her to get the Vaseline. She said that she did not know why he asked her to get the Vaseline but that she complied and brought it into the master bedroom. She testified that the Defendant then said that he was going to show her how babies were made. She recalled that, after he pulled down her underwear and removed his, he instructed her to put Vaseline on her vagina. She testified that the Defendant laid behind her in the bed, stuck his penis in between her legs, and moved back and forth. She recalled that what he did hurt her vagina. She said the pain felt the same as the pain she felt when the Defendant put his fingers inside her vagina on other occasions. However, she testified that she did not remember if the Defendant penetrated her during the "Vaseline incident," saying, "I don't remember him sticking anything in me. It just hurt."

She admitted that, at the time of the incident, she did not tell anyone about what the Defendant did to her because she was scared. She said that, when her family lived in Tullahoma, she eventually told her mother what happened and, as a result, was taken to the hospital and spoke to a police officer. A.C. acknowledged that while she was at the hospital, she drew pictures of the Defendant's penis and a diagram of their sexual activities in the house. She also testified that when she was six or seven years old, she had never seen a full-

---

[1] It is the policy of this Court to refer to minor victims of sexual abuse by their initials.

grown man's private parts, other than the Defendant's, and that she had never seen any type of pornography, explaining, "He didn't allow us to have TV in the house. The only thing we watched was movies, and they was PG." The pictures that she drew on December 4, 1997, were entered into evidence.

A.C. testified that, shortly after she made her allegations in December 1997, she spoke privately with her grandfather, Jackie Ward. Mr. Ward told A.C. that God wanted her to tell the truth, discussed right and wrong with her, and prayed with her. Then, when he asked her if what she said was really true, she recanted her accusations. During the trial, she explained that she recanted because she was scared and did not want to break up her family. However, she also acknowledged that she told her grandfather that the reason she made up the story was so that they could move back to the farm in Collinwood.

In December 2006, the Defendant and A.C.'s mother separated. A.C., her younger sister, and her mother moved in with Mr. Ward. Shortly afterwards, A.C.'s mother asked her if the allegations she made when she was seven years old were true. A.C. said that she told her mother they were true and testified that "the only reason why I told her, again, was because I felt safe. Because I was scared of him in the house."

Regarding the time frame of the "Vaseline incident," A.C. was unsure. She testified that it happened after her younger sister, H.C., was born and that H.C. "was little." Initially, she said that she thought it happened when H.C. was about six months old, but then she said that she did not remember exactly when it happened. She testified, "I mean, he, he molested me so much, I don't remember exactly what time or what date." A.C. also mentioned that, on other occasions, the Defendant digitally penetrated her and had oral sex with her, however, she could not say with any degree of certainty that those alleged acts occurred between May and June 1996.

Vanessa Carter, A.C.'s mother, testified that she was married to the Defendant for fourteen years and that they had one child together, H.C., who was born April 22, 1996. She said that she had two children from previous relationships, J.C. and A.C. Ms. Carter recalled that, in 1996, she, the Defendant, and her three children, were living in a house in Collinwood. She testified that, during the first week of July 1997, the family moved to Tullahoma. She said that on December 4, 1997, A.C. told her that the Defendant had raped her and hurt her. She stated that she called the police and that her friend took A.C. to the hospital.

Ms. Carter testified that, after A.C. made the allegations against the Defendant, she and the children went to live with her parents in Collinwood. Ms. Carter said that her father spoke with A.C. on December 8, 1997, four days after A.C. made her initial allegations, and

that A.C. told him that she had lied and the allegations against the Defendant were not true. Ms. Carter testified that A.C. said that the reason she lied was because she wanted to move back to Collinwood.

During May and June 1996, Ms. Carter was not working outside the home, but the Defendant was working at least six days per week. During that time, Ms. Carter had no indication that there was anything inappropriate going on in her home. She said that, after A.C. made the allegations, A.C. "would not discuss anything with me in depth. All she kept saying was, is he raped her, and he hurt her." Ms. Carter acknowledged that prior to December 1997, there had been problems with A.C. lying both at school and at home. After Ms. Carter and the Defendant separated on December 23, 2006, Ms. Carter asked A.C. about her previous allegations. Ms. Carter testified, "And because of the animosity and stuff that had gone on, I asked her could it have been true. And she said, yes, and told me everything."

The evening of December 4, 1997, Officer Lauren Nettles was working for the Tullahoma Police Department when she got a call to go to the Harton Regional Medical Center to speak with A.C. Officer Nettles read to the jury the report she made about the incident:

> [A.C.] stated that her step-dad started talking to her about body parts and where babies came from. [A.C.] stated that her step-dad took his finger and inserted in her vagina. She stated that her little sister started to cry, so she got up and took her little sister into the mom and dad's room. And the dad left his room and come back into her room, which was [A.C.'s] room, and began to finger [A.C.'s] vagina.

> [A.C.] stated that when they lived in Collinwood, the step-dad went into her room and pulled her panties off, and pulled his shorts off, putting her on top of him, moving her up and down.

> [A.C.] stated that he also, while living in Collinwood, that while mother and siblings were gone to the store, the dad showed her where babies come from. He started—[t]hat he told her to go back—go get the Vaseline. He told her to put her finger in the Vaseline and put it on her vagina. She stated that he put his penis on her vagina and started rubbing it up and down. [A.C.] stated that he told her, if she told, he would have to talk with her, and that made her scared. [A.C.] stated that she told her mother the night of 12/4/97.

Officer Nettles testified that she turned the case over to an investigator and that she had no further involvement after taking A.C.'s statement. She also testified that she did not

-4-

remember A.C.'s demeanor on December 4, 1997, nor did she remember whether A.C. seemed truthful.

Peggy Palmer, a registered nurse working in the Harton Regional Medical Center Emergency Room when A.C. came in on December 4, 1997, testified that she interviewed A.C. She said her notes reflected that A.C. told her the following:

> One day, when my mom went to the store with my brother and sister, he told me to get the Vaseline and come here, and I did. . . . And he said, I'm going to show you how babies are made. And he took my pants off, and his pants off, and he had me turn on my side, and he got behind me and put his thing there, and did it. Then, after it was over, he said, we better clean the yard.

Ms. Palmer recalled that A.C. did not tell her where or when this incident occurred and that she was unable to testify the event described occurred in May or June of 1996. Ms. Palmer testified that after she interviewed A.C., she called the Tullahoma Police and the Department of Children's Services. She also testified that she called A.C.'s mother to get permission to treat A.C. because she had not accompanied A.C. to the hospital.

Dr. Clifford Seyler was certified as an expert in the field of medicine and pediatrics by the trial court. He testified that, on December 4, 1997, he was the doctor-on-call at the Pediatric Center of Tullahoma and was called to the Harton Regional Medical Center to examine A.C. He testified as follows:

> And she basically told me that her step-father, who is called Jeff, asked her to—told her he was gonna show her how to make babies. And with that, he pulled her pants down or her underwear down, and pulled his pants down. And he then made an attempt, according to the child, to have intercourse with her. He did so, apparently, because he was not able to—the child said it hurt—and he wasn't able to achieve penetration.

> He turned the child over, and entered the child between the folds of her legs, from the rear. And then she goes on to describe that he had put the Vaseline on himself, to lubricate apparently. And that he went ahead and then ejaculated, because she was able to describe a sticky thick substance that had a foul smell to it, after the event was over with.

Dr. Seyler performed a physical exam on A.C., but said "[t]hat there was no evidence of any physical harm to the child's genitalia." However, he testified that this did not surprise him

because the event she described happened long before he examined her.[2] He explained that A.C.'s hymen was intact and "completely normal." He said that "there was no physical evidence that this child had been sexually abused." However, he also testified that in "somewhere between 85 to 90 percent of all child sexual abuse there is no physical findings that correlate with sexual abuse."

Regarding the physical aspects of penile penetration, Dr. Seyler testified that "if you had any significant amount of depth of penetration, you'd probably have taring [sic]. You'd have some physical findings of it." Dr. Seyler also testified that, "if you have a normal adult anatomy, at seven years of age, and you enter a full inch, you're gonna have taring [sic] of the hymen." However, he also testified that it was possible to have entry "[t]hrough the labia into the introitus, without entering into the hymen."

Dr. Seyler acknowledged that A.C. had told him that she had previously witnessed her parents having intercourse and that she discussed it with her older brother. However, he said that, after he spoke with A.C., he "felt that this was a genuine case of sexual abuse" and that "the child was truth-telling at the time." Dr. Seyler testified, "My observation was that this child gave the story that was entirely consistent with sexual abuse. And that, even though she had a negative physical examination, her story was so well put together and so well described that it could not be a figment of her imagination."

Jackie Ward, A.C.'s maternal grandfather, testified that he spoke to A.C. in December 1997, after she had made her initial allegations. He said that he regretted telling A.C., during their conversation, that her allegations would tear her family apart. He stated that, in hindsight, he wished he never said that because she may have recanted her allegations because she did not want anything to happen to her family. However, Mr. Ward testified that, in December 1997, he believed A.C.'s recantation, partly because she had been fabricating things at school and even had to see a school counselor as a result. He also knew that, prior to her recantation, A.C. had talked with boys about sex and body parts on the school bus.

Mr. Ward said that the day after A.C. had renewed her allegations,[3] the Defendant came over to Mr. Ward's house to bring a school project for H.C. Mr. Ward said that he spoke to the Defendant outside of his house and recalled, "He said, I did not rape her. And I said, Well, you know what you did. And he says, I shouldn't have touched her and let her

---

[2] Dr. Seyler did not testify as to what time frame A.C. told him these alleged events occurred, only that they were "within the year."

[3] The record is not clear whether A.C. renewed her allegations in December 2006 or January 2007.

touch me, or had her touch me." Mr. Ward also testified that the Defendant said, "Please forgive me," before he left. However, Mr. Ward admitted that the Defendant made no reference to what acts he was referring to, nor that his statements related to any acts between May and June 1996.

William Melton, a minister from Florence, Alabama, and a "minister friend" of Mr. Ward, counseled with the Defendant and Ms. Carter when they were having marital problems.[4] He testified that the Defendant called him on the phone one day and Mr. Melton recalled, "[H]e said, the biggest thing he did wrong was to allow her to fondle him." He said that this phone call might have occurred a couple of weeks after he had met with the Defendant and Ms. Carter to try to work out some of their marital difficulties. He recalled that the Defendant just blurted out this statement and that they had not been talking about A.C.'s allegations previously in the conversation. However, Mr. Melton admitted that he recalled "very little" about their phone conversation before or after the Defendant's admission.

Susan Clift testified that she was "very close friends" with the Defendant and had met him through Ms. Carter. She said that she and her granddaughter even resided with the Defendant and Ms. Carter for a year and a half between 2004 and 2006. Ms. Clift said that she was in contact with Ms. Carter at least two or three times per week and said that, a week or so after separating from the Defendant, Ms. Carter was contemplating a divorce, but she was also thinking about trying counseling.

She testified that three weeks after Ms. Carter and the Defendant split up, the Defendant called her. She recalled, "And he said, do you remember the accusations that were made against me, in Talluhoma [sic], about [A.C.]? And I said, yes, I remember. And he hesitated a moment and said, Well, they're true." She also later testified, "But he confessed to me that he did what he did in Talluhoma [sic], and the accusations were true is what he said." On cross-examination, she acknowledged that, about a week before he made the confession on the phone, she had gone over to his house and they had a long chat. However, she denied that they discussed the sexual abuse allegations and the Defendant's fears that Ms. Carter would use them to be vindictive.

The Defendant testified in his own defense. He said that, on January 16, 2007, within a couple of days of learning that Ms. Carter had filed for divorce, he learned that A.C. had renewed her allegations that he raped her when she was little. He testified that he spoke with

_____

[4] Mr. Melton did not know precisely when he spoke to the Defendant and Ms. Carter. During the trial on July 22, 2008, he said that "[i]t was well over a year-and-a-half ago." Later, he testified that they were separated when he met with them.

Mr. Ward that evening, but he denied saying that he should not have touched her or let her touch him, as Mr. Ward testified. He testified that the same night, after he spoke to Mr. Ward, he spoke to his mother, his sister, Ms. Clift, and Mr. Melton. He explained that "[b]ecause [his] life was turning upside down," he was looking for guidance on what to do next from his close friends and counselors. The Defendant denied making the statement that Mr. Melton had testified to and explained that he thought Mr. Melton misunderstood him because he said, "[A]nd now they're saying that I allowed my daughter to fondle me." The Defendant also denied that he made the statement to which Ms. Clift testified. He explained that seven to ten days before he learned A.C. renewed the allegations, he was talking to Ms. Clift and told her that he thought Ms. Carter would bring up A.C.'s previous allegations to make the Defendant look bad now that they were separated. He said that, when he called Ms. Clift on January 16, 2007, he said, "[W]hat I told you is true, she's brought it all up, brought up every bit of it."

The Defendant explained that, in May and June 1996, he worked six-and-a-half days per week at a mobile home dealership in Alabama. He said that he generally worked from around 7:00 a.m. to 7:00 p.m. and that he did not recall being left alone with any of the three children during the first six weeks after H.C. was born. He said that he first learned that A.C. alleged that he raped her in December 1997, when Ms. Carter called him at work to tell him. The Defendant testified that he never sexually abused A.C. and, when confronted with the pictures that A.C. drew in 1997, the Defendant guessed that she knew details of the male anatomy because A.C.'s brother said that they had watched pornography with their cousin. He testified that A.C. had a history of lying and that she would often try to get her brother and sister in trouble in order to make herself look good. Furthermore, he described the three people who testified that he made admissions to them—Mr. Ward, Mr. Melton, and Ms. Clift—as Ms. Carter's father, Ms. Carter's father's best friend, and Ms. Carter's best friend.

Charles "Doug" Hill testified that he had known the Defendant since the Defendant was a small boy and that the Defendant had worked for him at his mobile home business. He testified that he "couldn't ask for a finer employee" and that he completely trusted the Defendant. He also testified that he had accompanied Ms. Carter to the Department of Children's Services office in 1997, after A.C. had made her initial allegations. He recalled that Ms. Carter said that A.C. recanted her story, was angry at her parents, did not like her school and her friends, wanted to move back to Wayne County, and thought that the allegations would prompt her family to move back.

The Defendant also presented testimony from Dr. Penny Mediate, a family medicine doctor practicing in Lawrenceburg, who was A.C.'s physician from February 14, 1996, to December 9, 1997. Dr. Mediate testified that she interviewed both Ms. Carter and A.C. on

December 9, 1997, and took notes about the conversations. Her handwritten notes, which were entered into evidence, stated as follows:

> Interview [with] mom: Mom sts. since DHS incounter [sic] [A.C.] has admitted to lying about her stepfather touching her. Chart reviewed and prior history of problems with lying—off [and] on since Mom's 1st marriage ended in divorce—child presently in counseling at school for this problem. Content of what [A.C.] said probably from Playboy channel watched by [A.C.], bro [J.C.], and Derrick (cousin) at friend's home—no pornographic material available in home. (Bro) [J.C.] verbalized same sexual content as [A.C.] had said being unaware of present situation.

> Interview [with] Patient: "I told a lie about what happened." When asked specifically if anyone had touched her—she said "no[,]" "only a little boy at school had <u>tried</u> to touch her in the front and back." When asked specifically about dad touching her—she said no.

Dr. Mediate stated that her notes reflected that A.C. made eye contact and smiled spontaneously, that her training taught her that those were signs to help judge a person's credibility, and that she believed that A.C. was being truthful when she admitted to lying about her father abusing her.

Dr. Mediate stated that she also performed a physical examination during the appointment, which included examining A.C.'s vaginal area. She testified that A.C.'s hymen was intact and that she did not observe any external scarring, bruises, or scratches. She also testified that she had a legal duty to report instances of sexual abuse and that, in the time that she was A.C.'s doctor, she never saw anything to indicate that A.C. was being sexually abused.

On July 23, 2008, the jury convicted the Defendant of aggravated sexual battery, a lesser-included offense of rape of a child. On September 22, 2008, the trial court sentenced the Defendant as a Range I, standard offender to eight years in the Department of Correction. He now appeals.

**Analysis**

In this appeal, the Defendant contends that: (1) the trial court erred in allowing the State to use the doctrine of election to offer proof of prior bad acts, after the State had provided a bill of particulars describing one particular incident and repeatedly said that it intended to elect that incident; (2) the trial court did not follow the procedures mandated in Rule 404(b) of the Tennessee Rules of Evidence; (3) the trial court erred by allowing the jury

to hear about prior bad acts that occurred outside the time frame of the indictment; (4) the evidence at trial was insufficient to support his conviction because there was no evidence offered to support the time frame stated in the indictment; (5) the trial court erroneously allowed three witnesses to testify that the Defendant had confessed to them, without finding whether the alleged confessions pertained to the charged crime or prior bad acts; and (6) the trial court's failure to give a specific unanimity instruction was reversible error. The State consolidated the Defendant's first three issues into one issue and contended that the trial court committed harmless error by allowing the victim to testify about instances of sexual misconduct not specifically described in the bill of particulars. Because our holding requires that this case be remanded for a new trial, we choose to address all of the issues the Defendant raises separately in order to provide guidance to the parties and the trial court on remand or to facilitate possible further appellate review.

## I. Admissibility of testimony of bad acts outside the bill of particulars and the role of the doctrine of election

On May 11, 2007, in order to ascertain details of the offense for which he was indicted, the Defendant filed a Motion for a Bill of Particulars. The State provided[5] a handwritten statement that described how the Defendant told A.C. to put Vaseline on her vagina, laid behind her, and put his penis in between her legs. The statement added that this incident occurred when H.C. was about a month old.

During motion arguments before the trial began, the State said that it expected A.C. to testify that, during the same time frame as the "Vaseline incident," the Defendant also digitally penetrated her numerous times. After hearing this, the Defendant made an oral motion in limine to exclude such testimony because it was outside of what the State provided in the bill of particulars. The State argued that, under State v. Rickman, 876 S.W.2d 824 (Tenn. 1994), evidence of other sex crimes was admissible if they occurred within the time frame of the indictment, as long as the State elected which offense it wanted the jury to consider at the end of its proof. However, during the course of the motion arguments, the State consistently acknowledged, three separate times, that it was going to elect the incident described in the bill of particulars. Indeed, the State never suggested that it was considering the possibility of asking the jury to consider any act other than the Vaseline incident. The trial court agreed with the State's argument, stating that "any evidence could come in that

---

[5] The record is not clear about whether the State opposed the Defendant's motion or whether there was a hearing on the matter. The technical record contains the Defendant's motion, however it does not contain any response from the State regarding the motion. However, during motion arguments before the trial began, the prosecutor stated, "I objected to having to answer a Bill of Particulars, and the Court never really made a ruling on that. However, after having more conversations with [defense counsel], I agreed that we would try to be as specific as we could about the count that we alleged in the indictment."

occurred during the time span the indictment alleged." In his brief, the Defendant argues that such a tactic is "an end run around evidentiary rules" and misconstrues the doctrine of election.

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." In Rickman, the Tennessee Supreme Court noted that some jurisdictions were creating a "sex crimes" exception to that general rule that was "said to be for purposes of corroboration, or to show the intimate relations between the parties, or to show that the defendant had a lustful disposition." Id. at 825, 828. After examining the issue, the supreme court declined to adopt a "sex crimes" exception, reasoning that "[t]estimony of the *victim* about *other* prior unindicted sex crimes allegedly committed by the defendant upon the victim does not corroborate the testimony of the victim that he or she suffered the attack for which the defendant is *then* being tried." Id. at 830 (emphasis in original). The supreme court also noted "that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." Id. at 828. The Rickman court concluded that "the prejudice resulting from such testimony outweighs its probative value." Id. at 830.

The supreme court, however, recognized a narrow exception "admitting evidence of other sex crimes when an indictment is not time specific and when the evidence relates to sex crimes that allegedly occurred during the time as charged in the indictment." Id. at 829. The high court added that, "[i]n such cases, the State must elect at the close of its proof-in-chief as to the particular incident for which a conviction is being sought." Id. Regarding the doctrine of election, our courts have "held that when the evidence indicates the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought." State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999). The doctrine of election "ensure[s] that the jurors deliberate over and render a verdict based on the same offense." Id.; see, e.g., State v. Kendrick, 38 S.W.3d 566 (Tenn. 2001) (noting that the defendant was indicted for one count of aggravated rape, but the victim described that the defendant forced her to perform both oral sex and to engage in vaginal intercourse and, thus, it was an error that the State did not elect which offense it wanted the jury to consider).

In articulating this exception in Rickman, the court examined State v. Shelton, 851 S.W.2d 134, 138-39 (Tenn. 1993), which dealt with six and seven-year-old victims who testified "only in very general terms" and could "not differentiate one event from the others." In fact, such few details were known that the indictment charged the defendant with unlawful sexual penetration and unlawful sexual contact "on or about the __ day of _____, 1989."

Shelton, 851 S.W.2d at 136. The bill of particulars later narrowed the time frame to between April 7 and September 6, 1989. Id. However, the Shelton court said that it was not error that the trial court allowed the victims to testify to multiple incidents in the indictment period, as long as the State elected, at the close of its proof, which incident it wanted the jury to consider. Id. at 139. In Rickman, the court explained that one of the primary purposes in reaffirming this exception was "to allow the State some latitude in the prosecution of criminal acts committed against young children who are frequently unable to identify a specific date on which a particular offense was committed." 876 S.W.2d at 828.

In the instant appeal, although the State provided the Defendant with a bill of particulars specifying the Vaseline incident and repeatedly said that it intended to elect this incident at the close of its proof, the trial court ruled that Rickman permitted A.C. to testify to other acts of abuse during the time frame specified in the indictment. We respectfully disagree with the trial court's application of the Rickman exception.

Rule 7(c) of the Tennessee Rules of Criminal Procedure provides, "On defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charged." A bill of particulars serves three purposes: (1) it provides a "defendant with information about the details of the charge against him if this is necessary to the preparation of his defense," (2) "it assures that a defendant has an opportunity to 'avoid prejudicial surprise at trial,'" and (3) "it enables the defendant to preserve a plea against double jeopardy." State v. Sherman, 266 S.W.3d 395, 408-09 (Tenn. 2008) (quoting State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991)). Our supreme court has stated that "the purpose of the bill of particulars is to alert criminal defendants as to how the State will proceed with the litigation." Id. at 409 (noting, however, that "the State is not precluded from pursuing theories of criminal liability that are not mentioned in the bill of particulars"). Our high court has also stated that the State may be required to provide "details as to the nature, time, date, or location of the offense" in the bill of particulars. State v. Speck, 944 S.W.2d 598, 600 (Tenn. 1997).

As discussed above, in justifying the Rickman exception, our supreme court stated that the State should be allowed "some latitude" because young victims "are frequently unable to identify a specific date on which a particular offense was committed." Rickman, 876 S.W.2d at 828. Although there was an issue regarding the time frame of this incident,[6] the scenario presented in this case is distinguishable from one of the stated purposes of the Rickman exception. This was not a scenario in which a child victim alleged she had been abused, provided a vague description of events, and the State had to wait and see what the child testified to in front of the jury in order to properly align its case with the indictment. In

---

[6] This issue will be discussed in Section V.

-12-

this case, the indictment was specifically based upon the Vaseline incident. The prosecutor even acknowledged that fact during his motion argument, stating, "I believe that the Court should allow the State to introduce evidence within the timeframe of the indictment, which of course is the Vaseline episode." (emphasis added) Here, the State chose to use the Rickman exception as a tactic to allow the jury to hear that the Defendant had also digitally penetrated the victim, not because it needed "some latitude" dealing with a young victim unable to identify a specific date.

The handwritten statement that the State provided to the Defendant as the bill of particulars stated as follows:

> During the day in the house Mom gone to store with [J.C. and H.C.] right after she was born (she was about a month old). He was on the phone. When he got off the phone [h]e walked back in the bedroom where I was and told me to go get the Vas[e]line[.] I went in the bathroom and got the Vas[e]line. (Didn't know what he wanted he [sic] with it.) He told me to come there into his and mom's room [illegible], the master bedroom. He had me stick my finger in the Vas[e]line and told me to put it on my thing and then he made me get on my side and he got behind me and was on his side and stuck his thing in between my legs. I asked him what he was doing and he said he was showing me how to make babies. He put Vas[e]line on his penis. He was going back and forth against my vagina and it hurt. I just sat there. Didn't see any blood[.] It was quick. When he got finished he got up and said[,] "We got to go clean up the yard." Mom was gone about 30 minutes.

In this case, unlike Shelton, the State was specific about the incident that it planned to ask the jury to consider. In fact, in its brief, the State conceded "that where, as in this case, the bill of particulars describes a single episode of sexual misconduct, evidence of other misconduct not included in the bill of particulars should be considered in the same way as other uncharged misconduct under [Tennessee Rule of Evidence] 404(b)."

Moreover, the State made it clear at least three separate times during motion arguments that it knew all along that it was going to elect the Vaseline incident:

> [General Dicus]: The one incident that the State answered in relation to the Bill of Particulars, that it would elect at the close of its proof, is an incident involving them being at home together, and [the Defendant] asking her to go get the Vaseline . . . .
>
> . . . .

-13-

[General Dicus]: The State's prepared to do that, Your Honor, and to elect at the close of its proof, and we will elect what we've told them in [the] Bill of Particulars, which is this Vaseline incident I've mentioned.

. . . .

[General Dicus]: [Discussing that in response to the Defendant's Motion for a Bill of Particulars the State] had [A.C.] prepare a statement and drawing, that is Exhibit 1 to this motion, and still agree that that's the one we want to elect on.

. . . .

[General Dicus]: [Discussing that although A.C. could not testify conclusively to the time frame of the alleged incident, it did not matter because] the incident itself has not changed. The Vaseline incident. The details, what I provided to them, in response, the incident itself, but they were certainly put on notice of that.

Thus, after a thorough review of the record, we conclude that it was not proper to apply the Rickman "exception" to this case—one in which there was only one indicted offense, the State provided a very detailed bill of particulars describing the Vaseline incident, and the State acknowledged at least three times that it intended to elect the Vaseline incident. We agree with the Defendant that the State's tactical maneuver was improper and that the trial court incorrectly relied upon the Rickman exception and the doctrine of election to allow the jury to hear prejudicial testimony about an unindicted incident of digital penetration. Having determined it was error to allow testimony beyond the Vaseline incident, we will discuss whether it was harmless error, as the State argues, below in Section IV.

## II. Analysis required by the trial court under Tennessee Rule of Evidence 404(b)

The Defendant contends that the trial court erred when it did not follow the procedure dictated in Tennessee Rule of Evidence 404(b). During motion arguments on the day trial began, the Defendant asked for a 404(b) hearing, at which time a hearing was held and A.C. testified. She recalled the details of the Vaseline incident, but also stated that, when her family lived in Collinwood, the Defendant would get in bed with her, perform oral sex on her, and digitally penetrate her. She said that these incidents of oral sex and digital penetration "happened before the Vaseline incident" but that she did not know how long before. She said that she could not testify to the time frame of the various incidents because the Defendant would "do stuff" to her "every other night." She also testified that the

-14-

Defendant asked her "to suck his penis like it was a lollipop" but that she refused. Despite the fact that the Defendant reminded the trial court, on three separate occasions during motion arguments, that it needed to make specific determinations to comply with Tennessee Rule of Evidence 404(b), the trial court did not make any specific determinations, only saying, "I'm going to allow anything that happened. I think I'd already ruled, any evidence could come in that occurred during the time span that the indictment alleged. I think that's what the case said."

> Tennessee Rule of Evidence 404(b) provides:
>
> (b) Other Crimes, Wrongs, or Acts.—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

On appeal, we afford no deference to a trial court's Rule 404(b) decisions "unless there has been substantial compliance with the procedural requirements of the Rule." State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997). Where the trial court substantially complied with these requirements, we review its decisions under an abuse of discretion standard. Id. In the instant case, it is clear that the trial court did not substantially comply with the requirements set forth in Rule 404(b). Although the trial court did hold a jury out hearing, it did not "determine that a material issue exists other than conduct conforming with a character trait," "find proof of the other crime, wrong, or act to be clear and convincing," or determine if the evidence's probative value outweighed the danger of unfair prejudice. Thus, as our supreme court stated in Dubose, "the determination of admissibility will be made by the reviewing court on the evidence presented at the jury out hearing." 953 S.W.2d at 653.

After carefully reviewing A.C.'s testimony during the jury-out hearing, we cannot conclude that "a material issue exists other than conduct conforming with a character trait." During the jury out hearing, A.C. testified that the Defendant performed oral sex on her, asked her to perform oral sex on him, digitally penetrated her, and that the abuse happened

"every other night." As we discussed above, it is clear that the only offense for which the Defendant was indicted was the Vaseline incident. A.C.'s testimony about these other alleged sexual acts did not go to the material issue of whether the Defendant raped her during the Vaseline incident. Rather, A.C.'s testimony was propensity evidence, precisely what the Rickman court feared when declining to adopt a "sex crimes" exception to Rule 404. See Rickman, 876 S.W.2d at 828 ("The general rule excluding evidence of other crimes is based on the recognition that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial.").

We also conclude that the evidence should have been excluded because its probative value is outweighed by the danger of unfair prejudice. The Tennessee Supreme Court has explained that unfair prejudice is "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting an explanatory note in Rule 403 of the Federal Rules of Evidence). A.C.'s testimony that the Defendant performed oral sex on her, asked her to perform oral sex on him, digitally penetrated her, and abused her "every other night" when she was a young child, certainly had the tendency to suggest a decision on an improper basis. Thus, we believe that A.C.'s testimony regarding the Defendant's prior bad acts should have been excluded from evidence after the Rule 404(b) hearing. Having determined that the testimony was inadmissible, we will determine whether it was harmless error, as the State contends, below in Section IV.

### III. Testimony not specifically related to the time period in the indictment

The Defendant contends that the trial court erred when it allowed A.C. to testify to events outside of the May and June 1996 time frame that was set forth in the indictment. During A.C.'s testimony, the trial court overruled the Defendant's objection and allowed her to testify, "I mean, he, he molested me so much, I don't remember exactly what time or what date." She also went on to say that he molested her every month, every week, and every other day.

We agree with the Defendant that the testimony was inadmissible because it was testimony of prior uncharged sex crimes not included in the indictment and violated the holding of Rickman, 876 S.W.2d at 825. Moreover, "[t]he introduction of other sexual crimes *outside* the indicted period or in a 'date specific' indictment requires compliance with Rule 404(b) procedures." State v. Hoyt, 928 S.W.2d 935, 947 (Tenn. Crim. App. 1995) (emphasis in original), overruled on other grounds by Spicer v. State, 12 S.W.3d 438, 447 (Tenn. 2000). Regarding the statements at issue, there was no jury-out hearing, nor were there specific determinations made by the trial court regarding the criteria set out in Rule 404(b). The Defendant was on trial for one offense—the Vaseline incident. A.C.'s

statements were propensity evidence and were very prejudicial because she testified that he molested her "so much" and that he molested her every month, every week, and every other day. Under the traditional balancing test of Rule 404(b), we cannot say that the probative value of this evidence outweighed its prejudicial effect. We note that, on remand, if the State contends that these statements are admissible for some other purpose besides proving a character trait, then a Rule 404(b) hearing should be held and the trial court should make the required determinations.

## IV. Harmless Error Analysis

Although we have determined in the previous sections that the trial court erred by allowing the State to present testimony of unindicted sexual acts, our inquiry does not end there because we must determine if the error was harmless. In the recent Tennessee Supreme Court decision of State v. Rodriguez, the Court provided an in-depth discussion about harmless error and explained that there are three categories of error: structural constitutional error,[7] non-structural constitutional error,[8] and non-constitutional error. 254 S.W.3d 361, 371-72 (Tenn. 2008). We will analyze the issues presented in this appeal under the non-constitutional category of harmless error, because evidentiary issues are primarily analyzed by this approach and we see no reason why the issues presented here should warrant a different analysis. See State v. Powers, 101 S.W.3d 383, 397 (Tenn. 2003) ("[A]n evidentiary ruling ordinarily does not rise to the level of a constitutional violation."). The Defendant has the burden to show that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); Rodriguez, 254 S.W.2d at 372; see also State v. Martin, 964 S.W.2d 564, 568 (Tenn. 1998) (noting that "[a] violation of an evidentiary rule may not mandate reversal if the error 'was more probably than not harmless'") (quoting United States v. Barrett, 703 F.2d 1076, 1081-82 (9th Cir. 1983)).

When analyzing a non-constitutional error, appellate courts must consider the whole record. Rodriguez, 254 S.W.2d at 372. "The greater the amount of evidence of guilt, the heavier the burden on the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial." Id. Our supreme court has stated:

---

[7] The Court said that "[s]tructural constitutional errors are errors that compromise the integrity of the judicial process itself," and gave examples including "the complete denial of the right to counsel, racial discrimination in the selection of a grand jury, denial of the right of self-representation at trial, and denial of the right to a trial by jury." Rodriguez, 254 S.W.2d at 371.

[8] The Court noted that an example of a non-structural constitutional error was "the omission of a lesser included offense instruction." Id. at 371 n.16.

When an appellate court undertakes a harmless error analysis its purpose is to ascertain the actual basis for the jury's verdict. An inquiry into harmless error does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct. To the contrary, the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making. Where an error more probably than not had a substantial and injurious impact on the jury's decision-making, it is not harmless.

Id. (internal citations omitted). The Rodriguez court also guided that "[a] harmless error rule that is too lenient in nature risks denigrating the policies and interests that underlie non-constitutional rules of evidence in structuring a fair trial." Id. at 373. Our supreme court further noted that "when the rules of evidence and procedure stand unenforced through a finding of harmless error, there is no deterrence that would encourage future adherence to the rule." Id.

The evidentiary error under review in Rodriguez was whether it was harmless that the trial court admitted evidence suggesting that the Defendant, charged with child rape, possessed child pornography. Id. at 363. The State argued that the images should be admissible because "it goes to motive and intent to show that he [Mr. Rodriguez] has a thing for children." Id. at 364. Four of the State's six witnesses testified that Mr. Rodriguez viewed child pornography on the computer. Id. at 375. In its analysis, the Tennessee Supreme Court noted, "Demonstrating that Mr. Rodriguez 'has a thing for children' falls squarely within the category of propensity evidence." Id. Quoting the United State Supreme Court in Old Chief v. United States, 519 U.S. 172, 181 (1997), the Rodriguez court stated, "Although 'propensity evidence' is relevant, the risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment—creates a prejudicial effect that outweighs ordinary relevance." 254 S.W.3d at 375. Moreover, the court noted that the subject-matter of the propensity evidence at issue was even more troubling because "'[t]here is no subject which elicits a more passionate response than the sexual exploitation of children. Society abhors, and rightfully so, the victimization of the defenseless child.'" Id. at 376 (quoting United State v. Villard, 700 F. Supp. 803, 809 (D.N.J. 1988)). When analyzing whether it was harmless error that the trial court admitted evidence of child pornography in Rodriguez, our supreme court noted that "[t]he only evidence that Mr. Rodriguez sexually abused the two children was the testimony of the children themselves. Thus, the outcome of the prosecution hinged on the jury's assessment of the credibility of the two children and of Mr. Rodriguez." Id. at 377. The Court ultimately found that the error admitting the pornography could not be classified as harmless. Id. at 378.

In the instant case, the jury heard several mentions that the Defendant had sexually abused A.C., beyond that of the indicted offense—the Vaseline incident. When discussing the drawings she had made when she went to the hospital, A.C. indicated the rooms in the house where the Defendant performed other acts on her: "Right here (indicating), was the bedroom that he'd always come in there and did stuff to me. Right here (indicating), is where he was doing oral sex with me." When asked to explain another drawing, she said:

> He would do stuff to me in the bedroom. And like I said, he'd always come in the guess [sic] bedroom. I don't remember why I slept in there. But he would always come in there, and he would do things to me. And right here (indicating), it was in that room. And he was—he was—and he did oral sex with me. (Sobbing).

At another point during A.C.'s testimony, the following exchange occurred between the prosecutor and A.C.:

Q: Now, this other, that you're fixing to tell us about, when did it happen in relation to this Vaseline incident?

A: I don't know. I mean, he, he molested me so much, I don't remember exactly what time or what date.

Q: During this same time—now, you understand what I'm asking? The same time, or around the same time as the Vaseline incident, how often was it happening to you?

A: Quite a bit.

Q: Every month?

A: Yeah

Q: Every week?

A: Every other day. I mean, he would go in the bedroom with me, at night, when I was asleep, and just do things to me.

Q: What kind of things did he do?

-19-

A: He asked me to suck his dick and . . . like it was a lollipop, one night. And I told him, no. And then, he would sometimes stick his fingers in me. And he would do oral sex with me.

Q: When he would stick his fingers in you, how would that make you feel?

A: It hurt. And I told him to stop, and he wouldn't.

In the instant case, we are presented with a similar scenario to the one that the Rodriguez court faced, as the only evidence that the Defendant sexually abused A.C. was A.C.'s testimony. There was no physical evidence or witness corroboration of A.C.'s allegations. Both doctors who examined A.C. in December 1997 testified that A.C.'s hymen was intact and that they did not observe any physical indications of abuse. A.C. had recanted her allegations just four days after she initially made them, and the accusations did not resurface until nine years later when her parents had separated and her mother was contemplating filing for divorce. Just like Rodriguez, this case was one that depended on the jury's assessment of the credibility of A.C. and the Defendant. The jury heard A.C. mention several times that the Defendant performed oral sex on her, asked her "to suck his dick . . . like it was a lollipop," and digitally penetrated her. "The harmful effects of propensity evidence that undermines a defendant's credibility increase in close cases when the outcome depends on the jury's assessment of the witnesses' credibility. Errors in admitting evidence are less likely to be harmless in close cases." Rodriguez, 254 S.W.3d at 377. Moreover, admitting evidence of prior bad acts "carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than the conviction resting upon the strength of the evidence." State v. Thacker, 164 S.W.3d 208, 239 (Tenn. 2005). "The risk is greater when the defendant's prior bad acts are similar to the crime for which the defendant is on trial." Id. We believe that, more probably than not, hearing this propensity evidence affected the jury's assessment of the credibility of the witnesses and allowed the jury "to conclude more comfortably" that the Defendant sexually abused A.C. See Rodriguez, 254 S.W.3d at 377. Therefore, we reverse the Defendant's conviction for aggravated sexual battery and remand this case for a new trial because we cannot conclude that it was harmless error for the trial court to allow testimony of the Defendant's alleged prior bad acts and unindicted offenses.

## V. Sufficiency

The Defendant argues that the evidence at trial was insufficient because there was no evidence that the indicted offense occurred within the May to June 1996 time frame stated in the indictment. The bill of particulars that the State provided the Defendant stated that A.C.'s little sister, H.C., was about one month old at the time of the Vaseline incident. However, during the trial, A.C. testified that she was not sure when the Vaseline incident

occurred. She said that H.C. was born on April 22, 1996, and that it occurred after H.C. was born. She testified that H.C. was "little" and answered in the affirmative when the prosecutor asked if H.C. was "real little." During cross-examination, the defense counsel also tried to get A.C. to specify when the Vaseline incident occurred. However, she testified that she did not really know when the Vaseline incident occurred. A.C. did acknowledge that she had previously testified, earlier that day during the 404(b) hearing, that H.C. was six months old at the time of the incident.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

Regarding the time of the offense, Tennessee Code Annotated section 40-13-207 provides that an indictment does not have to state the time an alleged offense was committed, unless "time is a material ingredient in the offense." The statute also states that "the offense may be alleged to have been committed on any day before the finding of the indictment, or generally before the finding of the indictment." Tenn. Code Ann. § 40-13-207. This Court has held that if the dates alleged in the indictment are not "essential to proving the offense or to the imposition of a defense," then the State is "not required to strictly show" that the

offense occurred within those dates. State v. Howse, 634 S.W.2d 652, 657 (Tenn. Crim. App. 1982). Moreover, "[a] variance between an indictment or a subsequent bill of particulars and the evidence presented at trial is not fatal unless it is both material and prejudicial." State v. Shropshire, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000). "A variance is not material when substantial correspondence exists between the proof and the indictment." State v. Osborne, 251 S.W.3d 1, 15 (Tenn. Crim. App. 2007). This Court has also stated that, "[w]hen the indictment and the proof substantially correspond, the Defendant is not misled or surprised at trial, and there is protection against a second prosecution for the same offense, the variance is not considered material." Id.

Beyond proving the victim's age at the time of the offense,[9] time is not a material ingredient in aggravated sexual battery, the offense for which the Defendant was convicted. See Tenn. Code Ann. §39-13-504(a). Thus, "any variance between the time alleged in the indictment and the time proven at trial is not a material variance." State v. Thomas Dee Huskey, No. E1999-00438-CCA-R3-CD, 2002 WL 1400059, at *190 (Tenn. Crim. App., Knoxville, Oct. 11, 2002) (finding that it was not a material variance when the indictment stated the offense occurred between August 23 and September 6, 1991, and the victim testified that it occurred during the second week of August); State v. Brown, 992 S.W.2d 389, 392 (Tenn. 1999) (finding that although the State elected an offense between April 11 and June 30, 1993, and the proof showed that the offense happened before April 11, 1993, the evidence was not "legally insufficient in this regard" because the State was not required to prove an offense was committed on a specific date); see also State v. Vickers, 985 S.W.2d 1, 9 (Tenn. Crim. App. 2002) (noting that it was "immaterial" that the indictment alleged the offense was committed in April 1990, while the proof at trial showed that it was committed in August 1990, because both dates were before the indictment was filed). In the instant case, although the State did not prove the Vaseline incident occurred between May and June 1996, A.C. testified that it occurred when her sister was "little," and at one point, speculated that it might have been around October 1996, when her sister was six months old. Thus, because we conclude that there was not a material variance between the time frame in the indictment and the proof offered at trial, we disagree with the Defendant that the evidence was insufficient to convict him. This issue has no merit.

## VI. Testimony from three witnesses regarding the Defendant's statements
The Defendant argues that "the trial court erroneously allowed three witnesses to testify that the Defendant had confessed to them, without finding whether the alleged confession pertained to the charged crime or prior bad acts." In his Motions In Limine II, III, and IV, the Defendant moved to exclude the testimony of Susan Clift, Henry Melton, and

---

[9] We note that A.C. was born on April 27, 1990, and it is undisputed that she was less than thirteen years old at the time of the alleged Vaseline incident.

Jackie Ward because, according to the motions, the State had given notice that it intended to illicit testimony from the witnesses that the Defendant "admitted that alleged inappropriate sexual contact occurred between the Defendant . . . and the alleged victim . . . in Tullahoma, Tennessee, in the calendar year 1997." The Defendant argued that evidence "associated with said 1997 incident" should be excluded under Tennessee Rules of Evidence 402, 403, and 404. The State contended that the Defendant's statements were admissible as an admission of a party-opponent. The trial court did not conduct a 404(b) hearing, did not determine whether the statements were relevant to the Vaseline incident, nor did it make any determinations or comments about the subject besides the following:

> [Trial Court]: Well, let me see if I'm anywhere close to being on the proper page with you people. One of the issues we were talking about was, whether or not to admit the three alleged declarations against interest, that Mr. Carter had made to, as I understood what you said, three different people—
>
> [General Dicus]: Yes, sir.
>
> [Trial Court]: —in Talluhoma [sic], wasn't it? Or—
>
> [General Dicus]: No, sir. All those admissions were made here in Wayne County—
>
> [Trial Court]: Okay. Oh, in Wayne County.
>
> [General Dicus]: —fairly recently as far as when the indictment came out.
>
> [Trial Court]: I think that that's admissible. I don't have any problem with that. I think all the evidence that you can prove that occurred during the timeframe of the indictment is admissible. . . .

This Court has previously stated, "The admission of evidence is largely discretionary with the trial judge, and her discretion will not be disturbed on appeal unless there is clearly an abuse of that discretion." State v. Gray, 960 S.W.2d 598, 606 (Tenn. Crim. App. 1997). Our supreme court has said "that an appellate court should find an abuse of discretion when it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997). Here, it appears that the trial court did apply an incorrect legal standard because it looked at when the statements were made with regard to the time frame of the indictment, rather than determining the relevancy of the statements.

-23-

Thus, we will review the relevancy of the evidence based on the testimony presented at trial.

Tennessee Rule of Evidence 803(1.2) states that "[a] statement offered against a party that is . . . the party's own statement in either an individual or representative capacity" is not excluded by the hearsay rule. However, evidence that "is not relevant is not admissible." Tenn. R. Evid. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Moreover, as discussed in Section II above, Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait."

After reviewing the testimony of Mr. Ward, Ms. Clift, and Mr. Melton, we conclude that the Defendant's concerns regarding the relevance of his alleged admissions were legitimate and that the trial court erred by not conducting a more extensive inquiry into their admissibility. Mr. Ward testified that he spoke with the Defendant the day after A.C. renewed her allegations and recalled, "He said, I did not rape her. And I said, Well, you know what you did. And he says, I shouldn't have touched her and let her touch me, or had her touch me." Mr. Ward admitted that the Defendant made no reference to what acts he was referring to and that he did not know if the statements related to any acts between May and June 1996. Mr. Melton testified that the Defendant "said, the biggest thing he did wrong was to allow her to fondle him." The fact that the Defendant allegedly said that he should not have let A.C. touch him or fondle him leads us to conclude that these statements were not about the Vaseline incident. In all of the testimony about the details of Vaseline incident, there was no proof that the Defendant forced A.C. to touch him or fondle him. Thus, based on the trial testimony of Mr. Ward and Mr. Melton, it appears that the Defendant's alleged admissions to them were not referring to the indicted incident.

Similarly, Ms. Clift's testimony indicates that the Defendant's statement was about an incident that happened "in Tullahoma," which could not have been the Vaseline incident because that occurred in Collinwood. Ms. Clift testified as follows:

Well, I was at home and the phone rang, and I answered it. It was [the Defendant]. And he asked me how I was doing, and asked me if I was sitting down. And I think I replied, so I need to be? *And he said, so you remember the accusations that were made against me, in Talluhoma [sic], about [A.C.]? And I said, yes, I remember.*

*And he hesitated a moment and said, Well, they're true.* And I immediately just started crying, and I was devastated. I thought the world of

-24-

this man, and I found it really hard to believe, but I know that he confessed it to me and told me it was true.

.  .  .  .

He told me that he was sorry. And that he had not done anything to my grand-daughter, Alex, nor had he done anything to [H.C.]. And he just apologized. And to the best of my recollection, that was pretty much the conversation. I was just devastated. I was almost speechless. *But he confessed to me that he did what he did in Talluhoma [sic], and the accusations were true is what he said.*

(emphasis added). In Ms. Clift's recount, it is less clear whether the Defendant is referring to the Vaseline incident because, at first, he mentions "the accusations that were made against me, in Talluhoma [sic]." However, he then confessed to Ms. Clift "that he did what he did in Talluhoma [sic]." The first statement could have referred to A.C.'s allegations of the Vaseline incident or it could have referred to other allegations of abuse A.C. reported in Tullahoma.[10] The second statement clearly was an admission referring to acts he did in Tullahoma. Thus, looking at the whole statement, it appears that the Defendant's alleged admission to Ms. Clift was about a different act of sexual abuse and not the offense for which he was on trial. Because we have found that the Defendant's statements to Mr. Ward, Mr. Melton, and Ms. Clift did not refer to the Vaseline incident, it appears that they referred to "other crimes, wrongs, or acts," which is generally not admissible under Rule 404(b).

We will now examine whether the error to allow these three witnesses to testify about the Defendant's admissions was harmless. The Defendant argues that this error "compounded the other errors and rendered his trial unfair." As noted above, in Section IV, the evidence against the Defendant was hardly overwhelming. There was no physical evidence corroborating A.C.'s claim that the Defendant raped her, and the jury had to weigh the credibility of A.C.'s allegations and the Defendant's denials. In our view, hearing two witnesses testify that the Defendant admitted that he touched the victim and let her fondle him, coupled with Ms. Clift's testimony the Defendant admitted the accusations made in Tullahoma were true, more probably than not affected the jury's assessment of the credibility of the witnesses and allowed them to more comfortably conclude that the Defendant committed the offense for which he was on trial—the Vaseline incident. Therefore,

---

[10] The record reveals that on December 4, 1997, in Tullahoma, A.C. gave details of several alleged incidents of molestation, including the Vaseline incident that purportedly occurred in Collinwood. For instance, Officer Nettles' notes indicate that A.C. told her about three distinct incidents, only one of which was the Vaseline incident in Collinwood.

particularly when viewed in light of the other evidence erroneously admitted, we conclude that this error also requires a reversal of the Defendant's conviction and a remand for a new trial.

## VII. Unanimity Instruction

The Defendant contends that the trial court erred when it failed to give a specific unanimity instruction. The State argues that because "[t]he evidence and the arguments of counsel all focused on the 'Vaseline incident,'" then no specific unanimity instruction was needed. The State also argues that "if this Court were to determine that the trial court erred by failing to give an instruction on unanimity of the verdict, the error would be harmless."

At the close of the State's case, the following transpired:

[General Dicus]: And, also, State would elect a one-count indictment and ask the jury to consider the indictment to reflect the episode that [A.C.] testified to, before this jury, of the incident that occurred in Collinwood, Tennessee, where she was asked, by the [D]efendant, to go get the Vaseline, and her mother was at the store. And they went to the Master Bedroom, her panties were pulled off, and his pants were pulled off—

[Defense Counsel]: If your Honor, please, I think that's sufficient facts for election into the indictment for the incident that was testified about today.

[Trial Court]: All right.

[General Dicus]: So we're all clear, Your Honor, defense is satisfied that that is the indictment, that is the charge of which the State elects to go forward and ask the jury to consider.

[Trial Court]: All right.

On the last day of the trial, the Defendant asked the trial court for a special jury instruction stating the following:

In this action, the State has elected to proceed on one alleged act which constitutes the offense of rape of a child. For the Defendant to be convicted of rape of a child, you must find that on or about May or June 1996, in Wayne County, Tennessee, Jeff Carter, intentionally or knowingly sexually penetrated a minor child, [A.C.], date of birth April 27, 1990, a person less than thirteen years of age, when the Defendant,

-26-

Jeff Carter, told [A.C.] to retrieve Vaseline, stick her finger in the Vaseline, advised [A.C.] to get on her side and Jeff Carter then got behind her on his side and sexually penetrated her.

To prove the Defendant guilty of the criminal offense of rape of a child or any of the lesser included offenses which I will detail for you, the State must prove that the act just described occurred during the month of May or June 1996, and the proof of said act must be beyond a reasonable doubt.

The State opposed the special jury instruction. In argument, defense counsel argued that the jury heard testimony about digital penetration and oral sex, and stated "I think this jury has to know, from this Court, that the only thing they can convict him on is that specific event that the State elected to pursue." The prosecutor responded, in part, that he had already elected and would reemphasize the election in his closing argument.[11] Defense counsel argued that they should not rely on statements to be made in closing argument, and that the jury should have something in the instructions referring to the elected offense, as the jury was allowed to take the instructions into the jury room. The trial court overruled the Defendant's motion for a special instruction regarding the elected offense.

The Tennessee Supreme Court has stated that, "when the evidence indicates the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought." State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999). "The election requirement safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." State v. Johnson, 53 S.W.3d 628, 631 (Tenn. 2001). However, our supreme court has also held that the trial court does not need to provide the jury with an enhanced unanimity instruction, "even in cases where the proof does indicate more than one offense," because "[t]he election requirement itself alleviates any unanimity concerns." Id. at 635; see also State v. Buford, 216 S.W.3d 323, 325 (Tenn. 2007) ("Moreover, even in cases in which the proof indicates more than one offense, Tennessee requires an election of offenses instead of an enhanced unanimity instruction.").

Even though defense counsel interrupted the State's election, we conclude that it was sufficient to inform the jury as to which offense they were required to consider. Before he was interrupted, the prosecutor informed the jury that the State was electing "the incident that occurred in Collinwood, Tennessee, where she was asked, by the defendant, to go get the

---

[11] The prosecutor also argued that, because defense counsel cut him off during his election, it was not fair that the Defendant have a special instruction with "those specifics as he would word them."

Vaseline, and her mother was at the store. And they went to the Master Bedroom, her panties were pulled off, and his pants were pulled off." Moreover, during closing arguments, both the State and defense counsel argued to the jury that they were to consider the Vaseline incident. Therefore, we conclude that the State's election was sufficient to ensure that the jury deliberated and rendered a verdict on the same incident. This issue has no merit.

## Conclusion

Based on the foregoing authorities and reasoning, we conclude that the trial court committed reversible error when it allowed testimony of other bad acts and three irrelevant admissions of guilt that the Defendant allegedly made. Thus, we reverse the judgment of the trial court and remand the case for a new trial.

_____

DAVID H. WELLES, JUDGE